IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

GARY LEE WHEELER, JR.                                                                PLAINTIFF

      v.                    Civil No.  11-2002

DR. TINSMAN, Jail Doctor,
Sebastian County Detention Center;
CAPTAIN CONGER, Sebastian
County Detention Center; and
SHERIFF FRANK ATKINSON                                                        DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This case is brought under the provisions of the Americans with Disabilities Act (ADA).[1] Plaintiff proceeds *pro se* and *in forma pauperis*. When he filed this case, Plaintiff was confined to the Sebastian County Detention Center (SCDC).

Plaintiff, Gary Lee Wheeler, Jr., maintains he was discriminated on the basis of his disability while confined to the SCDC. Specifically, he maintains Defendants violated the ADA when: (1) he was not allowed to have his prosthetic leg while housed in the general population (GP) of the jail; and (2) his confinement to a hospital cell (HC) was under more onerous conditions than those of other inmates.

An evidentiary hearing was held in this case on July 23, 2013. The case is now before me for issuance of this report and recommendation.

---

[1]. Plaintiff originally brought a claim under 42 U.S.C. § 1983. However, both in his deposition and at the hearing, Plaintiff indicated he was no longer pursuing this claim.

-1-

## 1. Background

At the hearing, the testimony of the following witnesses was heard: (1) Larry Walden; (2) John Devane; (3) David Carson; (4) Anna Bazar; (5) Kim Taulbee; (6) Laura Aguirre; (7) Dr. Tom Tinsman; (8) Mike Conger; and (9) Gary Wheeler. For purposes of discussion, the testimony of the witnesses will be summarized.

### Gary L. Wheeler, Jr.

Wheeler testified he was booked into the SCDC on October 22, 2010. He remained incarcerated there until February 11, 2011.

Wheeler indicated he was only nine when his leg was injured resulting in a below the knee amputation. With respect to his prosthetic leg, Wheeler testified that he wears a gel liner that covers his stump. The leg then slips over the stump to just below his knee cap. According to Wheeler, the leg does have a titanium rod on the side. If the rod is removed, the leg does not function. He takes the leg off to shower and at night to sleep.

Wheeler testified that he was not initially placed in a HC cell. Instead, he was in the GP. On November 1st, following an altercation, and not a fall in the shower as Wheeler told officials at the time, Wheeler was seen by the doctor and moved to a HC. Wheeler was advised that he could not go back into GP unless he gave up his prosthetic leg.

While he was in BB pod, from October 22nd to November 1st, Wheeler testified he was assigned to an upstairs cell and had to hop up and down the stairs. He stated that he was able to move around without his limb. He could maneuver the stairs and the hall. However, he testified that he did request a shoe so that he did not have to hop along in a jail sandal. His request was refused by Sergeant Taulbee; Wheeler was told he could go to a HC.

-2-

On November 1st, Wheeler was moved into an HC cell. The other inmates in the HCs were in there for medical reasons. According to Wheeler, HC3 was handicap equipped with a shower in it but HC4 was not. Wheeler was confined to HC4 until his transfer back to GP. *See Plff's Ex.* A.

After being in a HC for a period of time, Wheeler was again housed in the BB pod. He was moved to BB pod when he decided to give up his leg to go back to GP. In late November, Wheeler asked to be moved to AA pod, a good behavior pod, although it was entirely upstairs. At meal time, he had to go down the stairs to get his tray but other inmates did help him with the tray.

Wheeler testified that he was given back his leg for a period of time when he was in GP. However, once medical staff discovered this fact he was put back into a HC. He again gave up his leg to return to GP.

While he was in a HC, Wheeler testified he never got to go to church services or to general education diploma (GED) classes. However, he conceded that he would not have qualified for inclusion in GED classes because he already had his GED. The GED classes were the only classes held at the SCDC. He also did not have access to a television or phone while in a HC.

On his hour out, Wheeler testified he showered. He did not shower in the cell because there were inmates sleeping on the floor. He also was able to use the phone during his hour out. However, he testified that the hour out occurred at various times of the day and often he could not call anyone during this time period. On occasion, if the guards were busy, he would be allowed out for more than an hour.

Wheeler testified he had been in the Arkansas Department of Correction (ADC) on three separate occasions. On each occasion, he was allowed to be in GP with his prosthetic leg. He also testified that he had been in the SCDC four separate times. During his other incarcerations, he was not required to go into a HC in order to keep his prosthetic leg. In fact, on one occasion he indicated he was a kitchen trustee.

**Larry Walden**

Walden was incarcerated in the SCDC during times relevant to this case. He was initially housed in a HC following a hospitalization. He remained in a HC cell for approximately seven days prior to being moved to GP.

There were two HC cells side by side. The HC cells had two bunks but there were usually three or four inmates assigned to each cell which resulted in inmates having to sleep on the floor.

While in a HC cell, Walden was locked down for twenty-three hours of the day. He was allowed out of the cell for approximately one hour a day. He had no access to church or school. While chaplains did go around to various pods, Walden was unaware of a chaplain coming to the HCs. He did not believe a chaplain visit could be requested.

Walden was shuffled around but was housed for a period of time in AA pod with Wheeler. Wheeler did not have his prosthetic leg and was assigned to an upstairs cell. Wheeler hobbled up two flights of stairs consisting of ten to twelve steps each flight. Inmates went down three times a day to get their meals and then went back up to eat them. Each inmate had to get his own tray. An inmate could not get two trays. Walden testified that Wheeler was housed upstairs in BB pod.

**Sergeant John Devane**

Devane is currently the jail administrator but in 2010 was a senior sergeant. Devane did not recall Wheeler.

Devane testified that pod AA was not ADA compliant. He testified the inmates had to climb stairs to get to the cells. When Wheeler was housed in BB pod, he was in cell 29 which was an upstairs cell.

The HCs were locked down except for one hour a day. However, Devane testified the inmates had the same access to church and classes as other inmates. Devane did not know who ordered Plaintiff to be housed in the HC pod.

Plaintiff's Exhibit D is a medical questionnaire completed when an inmate is being booked in. It indicates that Plaintiff had an artificial right leg. Devane could not recall any other inmates being housed at the SCDC with prosthetic limbs. The only SCDC policy that might apply to such a situation is the contraband policy, 7.08. Under the policy items were judged on whether they constituted a security threat.

Devane testified that Wheeler's first stop upon admission should have been at the medical department. The nurse could be asked if an inmate is able to physically get around.

**Officer David Carson**

In 2010, Carson was a detention deputy. Carson testified that once an inmate was assigned to a HC, he was only released when authorized by the medical staff.

Plaintiff's Exhibit A shows the HC cell that Wheeler was assigned to and how many other inmates were assigned to the same cell on the dates indicated. While they attempted to put only two or three inmates in each HC, there were times when more inmates were assigned. Carson testified that the first page of Plaintiff's Exhibit A indicated four inmates, including Wheeler,

were assigned to the HC four. The number of inmates assigned to a particular cell may vary on a day to day basis.

While Wheeler was in the HC, Devane testified that he gave Wheeler his trays. Devane could not recall if Wheeler had asked to attend church services or classes.

Nurse Aguirre authorized Wheeler's move from BB pod to AA pod after he signed a medical release saying he could go to GP if his prosthetic leg was taken from him. When Wheeler was taken to the GP, his prosthetic leg was placed in his property. Carson placed Wheeler in BB pod. Carson testified that Wheeler did not request crutches or a wheel chair. Had he made either request, Carson would have checked with the medical staff to see if Wheeler could have these items. The SCDC has a wheel chair that inmates can use; however, the inmate would not be put in GP.

Carson testified that Wheeler was not the first inmate at the SCDC with artificial limbs. In particular, Carson testified that one person with a below the knee prosthetic comes in on a recurring basis. This inmate is typically placed in segregation or a HC. Although Carson stated that he never understood why an inmate's possession of a prosthetic limb was a medical issue, Carson testified he did whatever medical asked him to. Carson could not recall an altercation occurring at the SCDC that involved the an artificial limb.

**Nurse Anna Bazar**

Bazar worked at the SCDC in 2010. Bazar testified that copies of the medical questionnaires completed when an inmate is being booked in are given to medical staff.

Bazar testified that it was the practice at the time to place inmates with medical appliances in a HC. She indicated she had the authority to order an inmate to be placed in a HC. Wheeler would have had his leg, stump, and mobility evaluated. The prosthetic would also be

-6-

evaluated for the presence of metal that could be used as a weapon. A sergeant would have been the one to decide if the prosthetic, or any part of it, was capable of being used as a weapon. On some prosthetics, Bazar testified that metal pieces could be taken off without the prosthetic becoming unfunctional. Bazar did not recall being involved in an evaluation of Wheeler's leg.

Once the evaluation was done, medical staff would discuss the situation with a security officer. However, Nurse Bazar testified that medical staff had no input on placement except in connection with the HCs. With respect to the number of inmates assigned to each HC, Bazar testified they tried to keep it down to two or three inmates in a cell and would move inmates in order to keep it below this level.

While in a HC, Wheeler was allowed his leg. Inmates in a HC are also allowed to use a wheel chair or crutches. Bazar recalled one other inmate with a prosthetic limb and he was placed in a HC.

**Sergeant Kim Taulbee**

While Taulbee worked at the SCDC in 2010 and could recall Wheeler's face, she could not recall any particulars about his incarceration. According to Taulbee, a prosthetic limb is considered to be contraband since it could be used as a weapon. This is the reason an individual with a prosthetic limb was usually kept in a HC or in segregated housing.

With respect to the medical questionnaires, Taulbee indicated that a copy of it goes to the medical staff and a copy is placed in the inmate's jail file. Taulbee testified the booking officer should not have put Wheeler in GP when he was first booked in. Wheeler was in GP from October 22nd to November 2nd when he was moved to a HC. During this time, Wheeler did not injure anyone.

She testified that a medical refusal form was used when medical staff recommended an inmate stay in a HC or in some type of segregation. The purpose is to release the SCDC from liability if the inmate is returned to GP.

**Nurse Laura Aguirre**

Aguirre was the nurse manager in 2010. She testified that any inmate with an apparatus had to go into a HC. She testified that there were three HCs designated HC2, HC3, and HC4. HC 3 and 4 each have two bunks, a shower with rails, and a door for privacy. Inmates in a HC are given one hour a day out of their cells. There are no radios or televisions in the HCs. However, she testified the HC cells were not used for any type of punitive confinement but were strictly used to segregate inmates based on their medical needs.

Aguirre testified she did not put Wheeler in a HC initially. She did not recall having seen him until November 1 when he was seen by the doctor and it was noted that he had a below the knee prosthetic. *Plff's Ex.* C. Wheeler reported having fallen in the shower that day. *Id.* He had a left facial contusion. *Id.* The doctor noted that "[s]ecurity should be aware that patient has a leg prosthesis." *Id.* In response to this, Aguirre testified she would have orally notified a day shift supervisor about Wheeler's prosthetic leg.

Aguirre testified that it was her recommendation that he be placed in a HC. Additionally, she indicated that a deputy was always present during the evaluations. When medical staff noted a potential security issue, the practice was for the deputy to get on the phone and it was determined where the inmate should be housed. In Wheeler's case it was determined that he should be placed in a HC. However, when she made her recommendation, Aguirre testified that she did not know Wheeler had been in the GP and would not have recommended that he be changed to a HC.

-8-

Wheeler was housed in a HC until November 18th. *Plff's Ex.* A. She recalled Wheeler asking to go back to GP. She explained to Wheeler that he could not have his leg when he was in GP. He was moved to BB pod and his leg was taken away. *Plff's Ex.* B. BB pod is a two tiered pod; Aguirre testified she didn't know if Wheeler was assigned a cell on the bottom tier or the upper tier. She indicated medical staff did not have any input as to which cell he was placed in.

On November 30, 2010, she required Wheeler to sign a release when he wanted to move from BB pod to AA pod. *Plff's Ex.* F. She was concerned that it was a completely upstairs pod and he would have to go up and down the stairs. Wheeler indicated he had friends who would help him get around. *Plff's Ex.* F. She testified that Wheeler specifically requested AA pod despite the fact that it has stairs because it was a good behavior pod.[2] Aguirre testified she saw Wheeler moving around on one leg and he didn't seem to have any problems.

On December 7th, Aguirre testified that he was moved from AA pod to a HC. He remained in a HC until December 12th. She had no further contact with Wheeler. To her knowledge, Wheeler was not allowed to have his prosthetic leg when he moved back to GP. Aguirre believed she has seen them on occasions having some type of church service being conducted in the HC area.

**Dr. Tom Tinsman**

Tinsman testified that it was his understanding that the SCDC's security policy precluded an inmate with a prosthetic limb, crutches, or a wheelchair, from being housed in GP. However, he noted a prosthetic limb has great potential to be used as a weapon. He would strongly urge that an inmate in GP not be allowed to retain his prosthetic limb.

---

[2] The form actually says "move from AA pod" but should say "move to AA pod."

Tinsman did not know why inmates in the HCs are locked down twenty-three hours a day. Tinsman believed the more hours an inmate could be out of his cell the better. It was not Tinsman's intent to deprive Wheeler of any services of the SCDC.

Tinsman characterized Wheeler's initial assignment to GP as a break in the system. With respect to the medical release signed by Wheeler on November 30th, Tinsman believed it would have been just as useful to have him sign one on November 22nd when he was initially placed in GP albeit in BB pod rather than AA pod. Technically, Tinsman testified that the medical staff does not have the final say as to where inmates housed in GP are placed.

Whenever an individual with any kind of serious medical issues becomes incarcerated, Tinsman testified he would ask if there was an alternate to incarceration. He stated that the more difficult it was to care for an inmate the more risk was involved.

With respect to Wheeler, Tinsman testified he did not know he was even in the jail until November 1st. Wheeler's prosthetic leg had a soft sock like devise that he pulled onto his stump.

When Wheeler was placed in a HC initially there were a total of four inmates assigned to the cell. Tinsman testified that Wheeler could have used his limb as a weapon while in a HC.

Tinsman testified that while Wheeler was in the HC he developed a sore at the distal end of his stump. Tinsman noted that this could be a serious issue if the sore became infected.

**Captain Mike Conger**

Conger testified he was the jail administrator in 2010. Conger indicated the SCDC's policy was to adhere to any recommendations made by jail medical staff. The SCDC has no written policy regarding inmates with artificial limbs. There was an unwritten policy that for the safety and security of inmates and that inmates with artificial limbs be housed in a HC or an isolation cell.

-10-

When Wheeler was booked in, he was not assigned to a HC for some unknown reason. Conger testified this would have been the responsibility of the front line supervisor.

Conger recalled being told that Wheeler fell in the shower on November 1st. This was the first injury of any type that Wheeler reported. Conger testified he did not know why Wheeler was put back in the BB in mid-November.

Conger stated that the protective custody cells and the HCs were on lock-down twenty-three hours a day. On the hour out, the inmates are allowed to use the phone, watch television, and shower. When asked about the number of inmates in the HC in which Wheeler was placed, Conger conceded there was no logic behind putting him in the HC with that many inmates. Clearly, Conger testified the prosthetic could still be used as a weapon.

Segregation cells are used for inmates who have disciplinary violations. These inmates are allowed out of their cells more than an hour a day.

Conger did not know that Wheeler was contending that he was being denied church services or GED classes while in a HC. An inmate's placement in a GED class is based on availability. Conger believed inmates in the HCs could be placed on the GED list.

Conger stated there was a chaplain on staff as well as volunteers. The chaplains were allowed to go to the HCs and conduct church services so long as they are done in the "back area."

**2. Discussion**

"Title II [of the ADA] provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010)(citation omitted). The ADA applies to correctional facilities. *See Pennsylvania Department of Corrections v.*

-11-

*Yeskey*, 524 US. 206 (1998)(Applying Title II of the ADA to prisons). "[D]eliberate refusal of prison officials to accommodate [an inmate's] disability related needs in such fundamentals as mobility, hygiene, medical care, and . . . prison programs" may constitute a violation of Title II." *United States v. Georgia*, 546 U.S. 151, 157 (2006). Reasonable accommodations must give a disabled prisoner meaningful access to the prison program in question. *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

> Of course, the right to reasonable accommodations is not absolute. Correctional facilities are not liable for failing to provide accommodations which were not requested, nor are they required to provide preferential treatment to disabled inmates. Moreover, a defendant may defeat a Title II claim by demonstrat[ing] that the requested accommodations would constitute an undue burden. Title II does not require "jails or prisons to take actions that unduly jeopardize their safety and security.

*Maxwell v. Olmsted County*, 2012 WL 466179, 6 (D. Minn. 2012)(citations and internal quotations marks omitted). "[T]he type of accommodation that will be enough to satisfy the [ADA's] reasonableness requirement must be judged in light of the overall institutional requirements. Security concerns, safety concerns, and administrative exigencies would all be important considerations to take into account." *Love v. Westville Corr. Ctr.,* 103 F.3d 558, 561 (7th Cir. 1996)(internal citation omitted).

      In *Baribeau*, a case relied on by Defendants, the Plaintiff's prosthetic leg was confiscated. *Id.* However, he was provided with the use of a wheelchair and an ADA complaint cell. *Id.* at 494-85. The Court found no ADA violation because the Plaintiff had not shown that he was excluded from any particular place or any regular activity of his while in the wheel chair. *Id.* It was also noted that he was incarcerated for less than forty-eight hours. *Id.* at 485.

      At issue in this case is Wheeler's placement in a HC under conditions more onerous than those applicable to non-disabled prisoners and the confiscation of Wheeler's prosthetic and the

failure to provide him with any mobility devices such as crutches, a walker, or a wheelchair so long as he was in GP.[3]  "To establish a violation of Title II of the ADA, [Wheeler] must demonstrate: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the jail's services, programs, or activities, or was otherwise subjected to discrimination by the jail; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability." *Baribeau*, 596 F.3d at 484 (citation omitted).

It is undisputed that Plaintiff is a qualified individual with a disability.  The record does not establish the existence of a uniform policy with regard to the housing of disabled inmates in general or more specifically in this case inmates having prosthetic limbs.  There was no written policy.  If an oral policy existed, it was not clearly understood as is demonstrated by the testimony of detention center personnel as to what steps should be taken and who had the final decision on where an inmate with a prosthetic limb could be housed.  When he was initially booked in, Plaintiff was allowed to keep his leg and put in GP.  No evidence suggests that any security concerns were raised at this time.  Further, on three prior incarcerations, Plaintiff was allowed to keep his prosthetic leg and even served as a trustee during one period of incarceration.

The testimony establishes that the decision to place Plaintiff in a HC was made by medical personnel instead of detention center personnel.  Plaintiff maintains he was excluded from church services, denied the freedom of movement, and access to television and the phone given to inmates generally. With respect to the church services, the evidence suggested that these

---

[3] Plaintiff testified that he could maneuver the stairs.

services would have been made available to the Plaintiff if he had requested them. Plaintiff did not recall specifically asking for the services.

However, with respect to his freedom of movement and access to television and the phone, it is undisputed that the HC conditions under which Plaintiff was housed were more onerous than the ones in GP. He was locked down twenty-three hours a day and did not have access to a television or a phone on the same basis as inmates in GP. His day-to-day activities were significantly curtailed.

While he was allowed to have his prosthetic leg in HC4, the two man cell was more frequently occupied by three or four inmates resulting in one to two inmates being on the floor. *See Plff's Ex.* A. Of the seventeen days covered in *Plaintiff's Exhibit* A, four inmates were in the cell seven days, three inmates were in the cell five days, and two inmates were in the cell on five days. Clearly, Plaintiff had little opportunity to be mobile despite the fact that he had possession of his prosthetic limb. Moreover, his confinement with other inmates while he had his prosthetic leg undercuts the security concerns put forth by Defendants. It appears little, if any, consideration was given to the provision of accommodations that would have allowed Plaintiff to remain in GP or given him more than an hour out of the cell a day within which to use the television or phone. His placement in a HC was based on his disability.

While he was in GP in both AA and BB pod, Plaintiff had an upstairs cell. He was given no mobility aids and in fact even refused a regular shoe instead of sandals/shower slippers. This meant Plaintiff was required to hop on one leg to move around the pod. The undisputed testimony was that to obtain his meals Plaintiff had to go downstairs. Once he was seen and given a tray, Plaintiff could ask someone to assist him in getting the tray upstairs. However, Defendants did not assign this duty to anyone; instead Plaintiff was required to find someone

-14-

willing to carry his tray. In fact, not only did Defendants not accommodate his disability, Plaintiff was at one point required to sign a release or waiver of liability in order to be housed in AA pod. No evidence suggests Plaintiff was provided with any accommodations. And, in fact, those accommodations that clearly would not create security concerns were not offered such as a regular shoe of some type and an inmate to carry his trays and/or assist him up and down the stairs.

In short, I believe Plaintiff has established that the Defendants' actions violated the ADA. It therefore has to be determined what type of relief Plaintiff is entitled to. Title II of the ADA adopts the remedies provision of the Rehabilitation Act, 29 U.S.C. § 794a, which in turn adopts the remedies provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. To recover compensatory damages, Plaintiff must show discriminatory intent. *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011). The Eighth Circuit has determined that "deliberate indifference is the appropriate standard for showing intentional discrimination." *Id*. (citations omitted). The Court noted that "[t]he deliberate indifference standard, unlike some tests for intentional discrimination, does not require a showing of personal ill will or animosity toward the disabled person, but rather can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Id.* (citations and internal quotation marks omitted). Thus, to recover compensatory damages, Plaintiff must show Defendants were deliberately indifferent to his rights under the ADA.

I believe Plaintiff has established Defendants were deliberately indifferent to his rights under the ADA both in connection with his housing in the HC and in connection with his housing in BB pod and AA pod without his prosthetic leg and without mobility aids. This time period

is began on October 22, 2010, and ended on February 11, 2011, when he was released--a total of one hundred and twenty-two days. Under the circumstances of this case, the Court believes it is appropriate to award compensatory damages on a per day basis of $100. Defendants shall also be responsible for paying the filing fee.

To the extent the complaint can be read as seeking injunctive relief, the claim was mooted when Plaintiff was released from the SCDC. *See Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999)(inmate's claims for injunctive and declaratory relief to improve prison conditions are moot when he is no longer subject to those conditions).

### 3. Conclusion

For the reasons stated, I recommend that judgment be entered in Plaintiff's favor on his ADA claim in the amount of $12,200.00. Further, I recommend that Defendants be required to pay the Court Clerk the $350 filing fee assessed against the Plaintiff in this case. Finally, I recommend that Plaintiff's request to dismiss his § 1983 claim be granted.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 8th day of October 2013.

/s/ *J. Marschewski*
   HON. JAMES R. MARSCHEWSKI
   CHIEF UNITED STATES MAGISTRATE JUDGE